**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WALTER L. MITCHELL, JR., <br><br> Plaintiffs, <br><br> v. <br><br> 3PL SYSTEMS, INC., <br><br> Defendant. | CASE NO. SACV 11-534 AG (ANx) <br><br> **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

This case arises from a dispute between former business partners concerning ownership of copyrights in freight transportation software. In April 2011, Plaintiff Walter L. Mitchell III sued his former company, Defendant 3PL Systems, Inc. ("3PL"), for copyright infringement and unfair competition. 3PL then filed 18 counterclaims against Mitchell. Before the Court are 3PL's Motion for Summary Judgment ("3PL's Motion") and Mitchell's Motion for Partial Summary Judgment ("Mitchell's Motion") on 3PL's counterclaims for copyright infringement, contributory infringement, and declaratory judgment. Mitchell also requests that the Court grant summary adjudication in his favor on all copyright issues in the lawsuit. After considering the arguments and papers submitted, the Court GRANTS in full 3PL's Motion and DENIES in full Mitchell's Motion.

**BACKGROUND**

In 1990, Marc Meskin and Robby Thone formed a freight transportation brokerage firm called Diversified Transportation Services ("DTS"). (3PL's Statement of Undisputed Facts ("UF") ¶ 2.) In 2001, Meskin, Throne, Mitchell, and several other individuals launched a new business venture to create transportation management software known as Freightsaver software. (UF ¶ 1.) In August 2002, DTS purchased the unfinished Freightsaver software from Meskin, Throne, Mitchell, and the other venture principals. (UF ¶ 3.)

DTS's purchase of the Freightsaver software was memorialized in an August 2002 Letter of Understanding (the "2002 Letter"). The 2002 Letter sets forth DTS's intent to convert the unfinished Freightsaver software into a "comprehensive transportation software brokerage product." (3PL Ex. 47.)

In October 2003, Mitchell and Meskin executed a second Letter of Understanding (the "2003 Letter") setting forth terms for the "continued development and future intentions of the transportation brokerage office management software." (UF ¶¶ 4, 5; 3PL Ex. 49.) The parties do not dispute that the "transportation brokerage office management software" referenced in the 2003 Letter is the software at issue in this case – software that ultimately came to be known as the Transportation Management System software (the "TMS software").

While the original draft of the 2003 Letter gave "Mitchell . . . exclusive rights to develop and manage the development of the TMS software," that language was removed before Mitchell and Meskin signed the 2003 Letter. (3PL Ex. 49.) The 2003 Letter also contemplated the creation of a "new enterprise" to eventually market and sell the TMS software. (*Id.*) The parties do not dispute that this "new enterprise" ultimately became 3PL. (UF ¶¶ 5, 6, 7, 16.) The 2003 Letter gave Meskin and Throne a combined 70% stake in 3PL and gave Mitchell an initial 25% stake – "24% for [his] time and effort, [and] 1% for [his] existing freightsaver.com ownership." (3PL Ex. 49.)

2

For the next couple years, Mitchell worked on the TMS software. During this period, Meskin met with Mitchell periodically to discuss the TMS software. (UF ¶ 8.) DTS paid Mitchell on a monthly basis for his work. (UF ¶ 9.)

The TMS software became operational in January 2005, about five months before 3PL was incorporated. (UF ¶ 11.) While the parties dispute when and whether DTS assigned 3PL rights to the TMS software, it is undisputed that from mid-2005 onward, 3PL sublicensed the TMS software to third-party freight brokers. (UF ¶ 17.) Mitchell received compensation from 3PL during this period, and in 2007, he became President of 3PL responsible for the company's daily operations. (Mitchell Motion at 3:20-23.)

In February 2005, Mitchell filed for and received a copyright for the TMS software under his name and his name alone. Mitchell registered new versions of the TMS software in 2007 and 2010, again under his name only. 3PL claims that Mitchell never informed anyone at the company of these registrations. Although Mitchell disputes that he hid these registrations from 3PL, he does not dispute that he wrote on 3PL's public website that 3PL was the holder of the TMS software copyrights. (UF ¶¶ 31, 37.)

In early 2011, the relationship between Mitchell and his fellow 3PL shareholders rapidly deteriorated, and on March 16, 2011, Mitchell was fired. Soon after, Mitchell sued 3PL asserting one claim for copyright infringement and two state law claims for unfair business practices. (Complaint *passim*.) 3PL responded by asserting its own claims against Mitchell for copyright infringement, among many others.

**PRELIMINARY MATTERS**

In his Opposition, Mitchell raises 12 evidentiary objections to 3PL's Motion. Three of Mitchell's objections are based on relevancy grounds under Federal Rule of Evidence 402. These objections seemingly ignore that a court can grant summary judgment only when there is no genuine issue of *material* fact. *See* Fed. R. Civ. P. 56(a). Because the Court can't rely on irrelevant facts, objections based on relevancy are redundant. *See generally Burch v. Regents of*

*the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (noting that parties may simply *argue* that certain facts are immaterial, instead of objecting to them on relevance grounds).

Mitchell raises a fourth objection on the ground that portions of the declarations supporting 3PL's Motion contain impermissible conclusions of law. This objection is also redundant. Improper legal conclusions also will not be considered on a motion for summary judgment because they are not *facts*. Mitchell's remaining eight objections are based on the "vague[ness] and ambigu[ity]" of portions of 3PL's declarations. Striking this evidence entirely on the basis of vagueness and ambiguity is unnecessary. To the extent the Court finds evidence to be vague or ambiguous, it will simply give such evidence less weight.

Mitchell's evidentiary objections are OVERRULED.

**LEGAL STANDARD**

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 269.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If, and only if, the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *Id.* at 322-23. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

**ANALYSIS**

The Court first considers Mitchell's Motion, before turning to 3PL's Motion.

**1. MITCHELL'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION**

As noted, Mitchell moves for summary judgment on 3PL's claims for copyright infringement, contributory infringement, and declaratory judgment. Mitchell also requests that the Court "summarily adjudicate that Mr. Mitchell is the sole author and owner of the copyrights for TMS [software]." (Mitchell Motion at 1:18-19.) Because nearly all of Mitchell's arguments are based on the premise that he, and he alone, owns the TMS software copyrights, the Court begins its analysis by addressing the question of ownership.

**1.1 Whether Mitchell Owns the TMS Software Copyrights**

Mitchell claims that he is the "sole owner and author of the [TMS] Software" and the "exclusive owner of all copyright rights for the TMS software application." (Mitchell's Motion at 4:11-12, 8:7-8.) 3PL, on the other hand, argues that the copyrights are "owned by 3PL and/or DTS under the work for hire exception of the Copyright Act [of 1976]." (Opp'n at 8:2-3.) *See* 17 U.S.C. §§ 101 *et seq.* Because there are genuine issues of material fact as to the ownership of the TMS software copyrights, the Court DENIES Mitchell's requests for summary judgment and summary adjudication.

**1.1.1 The Copyright Act and Work-For-Hire Exception**

Under the Copyright Act of 1976 ("Copyright Act" or "Act"), copyright ownership "vests initially in the author or authors of the work." *Community for Creative Non-Violence v. Reid*

("*CCNV*"), 490 U.S. 730, 737 (1989) (quoting 17 U.S.C. § 201(a)). "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Id.*

But the Copyright Act contains an important exception for "works made for hire." *Id.* If a work is made for hire, "'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary." *Id.* (quoting 17 U.S.C. § 201(b)).

A work by an *employee* is considered "made for hire" under the Copyright Act if the "work [is] prepared by an employee within the scope of his or her employment." *Id.* at 738 (quoting 17 U.S.C. § 101(1)). A work by an *independent contractor*, on the other hand, is considered "made for hire" only if the

> "work [is] specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

*Id.* at 738 (quoting 17 U.S.C. § 101(2)).

### 1.1.2 Application of the Work-For-Hire Exception

3PL contends that it owns all three TMS software copyrights, by assignment from DTS, under the work-for-hire exception. 3PL specifically argues that § 101(2) applies because DTS commissioned Mitchell as an independent contractor to develop the TMS software. 3PL also argues that § 101(1) applies because Mitchell was a DTS employee who produced the TMS software "in the scope of his employment." The Court addresses these arguments in turn.

### *Whether §101(2) of the Work-For-Hire Exception Applies*

Mitchell argues that §101(2) of the work-for-hire exception does not apply for several reasons. He first claims that while computer software may qualify as a "compilation" under §101(2), "3PL fails to provide evidence, either testimonial or documentary, that TMS is a 'compilation' as defined by §101(2)." (Reply at 3:9-12.) According to Mitchell, this deficiency stems from 3PL's failure to provide evidence concerning the TMS software *source code*. (Reply at 3:20-24.)

But Mitchell cites no case to support his claim that evidence of source code is necessary to raise a genuine question that the TMS software qualifies as a compilation. And nothing in the statutory definition of "compilation" leads the Court to conclude that such detailed evidence is required. *See* 17 U.S.C. § 101 (defining "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship").

3PL provides evidence that the TMS software was formed by the collection and assembly of various components. The 2002 Letter, for example, raises a question as to whether the Freightsaver software comprised part of the TMS software that Mitchell worked to develop. (3PL Ex. 47 ("[DTS] wishes [sic] purchase the framework of the incomplete Freightsaver.com software package for the purpose of converting the product to a comprehensive transportation software brokerage product.").) Mitchell's self-serving declaration that "Freightsaver.com code was not sufficient for the [TMS] project and was not used" does not eliminate the triable issue of fact that 3PL's evidence raises. (Reply at 4:18-22; Mitchell Decl. ¶ 5.) Evidence that the TMS software contained elements of the Freightsaver software and the MAS90 application precludes a finding that no genuine issue of material fact exists as to whether the TMS software qualifies as a compilation under § 101(2).

Mitchell next argues that § 101(2) does not apply because the parties did not expressly agree in a signed written instrument that the work would be for hire. *See* 17 U.S.C. § 101(2) (requiring that parties "expressly agree in a written instrument signed by them that the work

shall be considered a work made for hire"). But as 3PL explains in its Opposition, the 2002 and 2003 Letters may qualify as written instruments under § 101(2). (Reply at 4:6.)

Mitchell acknowledges the Letters, but attacks them for being "ambiguous writings at best." (*Id.* at 4:11-12.) This argument is unconvincing for several reasons. First, "there is no requirement, either in the [Copyright] Act or the caselaw, that work-for-hire contracts include any specific wording." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 (9th Cir. 2003). Second, the 2003 Letter states that "Walter Mitchell will be granted a contract for the continuing development of the [TMS] software" for a "new enterprise" – which Mitchell admits ultimately became 3PL. (3PL Ex. 49.) And third, 3PL provides extrinsic evidence showing that Mitchell wrote that the TMS Software was "created for DTS" in a 2003 proposal. (Meskin Decl. Ex. C at 2.) At trial, this extrinsic evidence may be used to resolve ambiguities in the 2003 Letter, which Mitchell drafted. *See Hartley v. Superior Court*, 196 Cal. App. 4th 1249, 1258 (2011) ("We construe ambiguities against . . . the drafting party.") The Court rejects Mitchell's argument that there are no disputed facts as to whether the Letters qualify as acceptable writings under § 101(2).

Because there are genuine issues of material fact as to whether the TMS software qualifies as a compilation and as to whether the 2002 and 2003 Letters qualify as acceptable written instruments, the work-for-hire exception in §101(2) prevents the Court from summarily adjudicating ownership of the TMS software copyights in Mitchell's favor.

### *Whether § 101(1) of the Work-For-Hire Exception Applies*

3PL next argues that § 101(1) applies because Mitchell "created the TMS Software within the scope of his employment with DTS and then later 3PL." (Opp'n at 14:20-27.) Mitchell responds that § 101(1) does not apply because he was an *independent contractor* of DTS, not an employee, when the TMS software was created. The Court finds that disputed factual issues concerning the applicability of § 101(1) also preclude summary adjudication for Mitchell.

8

In *CCNV*, the Supreme Court stated that "the term 'employee' should be understood in light of the general common law of agency." *CCNV*, 490 U.S. at 751. "'The hiring party's right to control the manner and means by which the product is accomplished' is the central inquiry" in determining employment status. *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 (9th Cir. 2010) (quoting *CCNV*, 490 U.S. at 751)). Other factors relevant to this inquiry include

> the skill required for that occupation, the source of the instrumentalities and tools, the location of the work, the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party, the extent of the hired party's discretion over when and how long to work, the method of payment, the hired party's role in hiring and paying assistants, whether the work is part of the regular business of the hiring party, whether the hiring party is in business, the provision of employee benefits, and the tax treatment of the hired party.

*Id.* (citing *CCNV*, 490 U.S. at 751-52).

Mitchell claims that he was not an employee because "he worked at home, on his own schedule, on his own computer to create the TMS source code and never delivered source code to DTS." (Reply at 5:19-24.) Mitchell also claims that he was not an employee of DTS because "[his] payments [from DTS] were reported by 1099 to the IRS as independent contractor payments and . . . [he] was not paid benefits." The "1099" Mitchell refers to is an Internal Revenue Service form used frequently by independent contractors. Mitchell does not address the other *CCNV* factors.

3PL argues that this evidence is insufficient to establish, as a matter of law, that Mitchell was an independent contractor. For purposes of this Motion, the Court agrees with 3PL. In *JustMed, Inc. v. Byce*, the Ninth Circuit affirmed the district court's ruling that a software developer was an employee, and not an independent contractor, despite the fact that the developer "wrote a majority of the code, working at his home on his own computers." *JustMed*, 600 F.3d at 1121, 1127 (finding that "[t]he nature of the business and the work . . . means that

9

[the developer's] ability to set his own hours and the fact that he worked from home are not particularly relevant").

While the court in *JustMed* acknowledged that the developer's receipt of 1099 IRS forms was highly probative of his status as an independent contractor, it stated that "[t]here is a danger . . . in relying on [this evidence] too heavily, because [it does] not bear directly on the substance of the employment relationship – the right to control." *Id.* at 1128 (holding that "[i]nsofar as JustMed did not comply with federal and state employment or tax laws, we do not excuse its actions, but in this context the remedy for these failings lies not with denying the firm its intellectual property but with enforcing the relevant laws").

3PL presents evidence sufficient to raise a genuine question of material fact as to Mitchell's employment status. 3PL's evidence shows, for example, that the parties intended for Mitchell to continue working for DTS and 3PL after completion of the TMS software. (*See, e.g.*, 2003 Letter, Meskin Decl. ¶¶ 8-9.) And indeed, Mitchell remained with DTS, and later 3PL, for years, "run[ning] the day-to-day operations of 3PL as its President, including hiring and firing employees, developing and maintaining the software and marketing the software to customers." (Motion at 3:20-22.) *Cf JustMed*, 600 F.3d at 1126 ("[t]he fact that the parties contemplated a relationship of indefinite duration cuts in favor of finding [that the developer is] an employee").

3PL also presents evidence showing that DTS retained control over the software by meeting periodically with Mitchell to discuss the Software and overseeing its overall development. (Meskin Decl. ¶ 9.) *Cf JustMed*, 600 F.3d at 1127 ("[i]nput from client regarding computer program's functions weighs heavily in favor of finding programmer an employee") (internal brackets and quotations omitted).

DTS and 3PL's tax treatment of Mitchell may make it difficult for 3PL to ultimately prove that Mitchell was an employee under § 101(1). But because genuine issues of material fact exist as to Mitchell's employment status, the work-for-hire exception in § 101(1) prevents the Court from summarily adjudicating ownership of the TMS software copyrights in Mitchell's favor.

### 1.1.3 Relationship Between DTS and 3PL

Ownership issues aside, Mitchell argues that summary judgment and summary adjudication are proper because DTS never assigned the rights in the TMS Software to 3PL. In response, 3PL claims that Mitchell lacks standing to argue that the purported assignment is invalid. The Court finds that disputed issues of fact regarding Mitchell's standing to attack the assignment precludes summary judgment and summary adjudication on this basis.

Under 17 U.S.C. § 204(a), "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." But "[s]ection 204(a) is designed to resolve disputes between owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *Jules v. Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146, 1157 (9th Cir. 2010). "When there is no dispute between the copyright owner and transferee, 'it would be unusual and unwarranted to permit a third-party infringer to invoke § 204(a) to avoid suit for copyright infringement.'" *Id.* (quoting *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995)).

Mitchell does not address 3PL's standing argument in his Reply. Instead, he argues that the "alleged assignment of the TMS copyright from DTS to 3PL is untimely and improper" because it was memorialized years after the oral assignment allegedly occurred. But as 3PL notes in its Opposition, "under some circumstances a prior oral grant that is confirmed by a later writing becomes valid as of the time of the oral grant, even if the writing is subsequent to the initiation of litigation on the copyright infringement." *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir. 1996). Regardless, disputed issues of fact concerning the validity of DTS's assignment of the TMS software copyrights to 3PL preclude summary judgment in Mitchell's favor on this basis.

**1.2 Conclusion**

Because genuine issues of material fact exist as to the ownership of the TMS software copyrights, the Court DENIES Mitchell's request for summary adjudication of "copyright issues." Aside from the issue of assignment, Mitchell's request for summary judgment is entirely derivative of his request for summary adjudication, and is DENIED for the reasons given.

**2. 3PL'S MOTION FOR SUMMARY JUDGMENT**

3PL moves for summary judgment on Mitchell's claims for copyright infringement and unfair business practices. The Court considers these claims in turn.

**2.1 Mitchell's First Claim, for Copyright Infringement**

3PL's request for summary judgment as to Mitchell's claim for copyright infringement is not based on its purported ownership of the TMS software copyrights. Rather, it is based on the affirmative defense of license. 3PL specifically argues that summary judgment is proper as to Mitchell's infringement claim because Mitchell granted 3PL an *irrevocable* implied license to use the TMS software. Mitchell acknowledges that he granted 3PL an implied license to use the TMS software, but argues that 3PL is liable for infringement nonetheless because the implied license was revoked when 3PL fired him. Mitchell is wrong.

**2.1.1 Whether 3PL Had a License to Use the TMS Software**

"The existence of a license creates an affirmative defense to a claim of copyright infringement." *Quest Software, Inc. v. DirecTV Operations, LLC*, 2011 WL 4500922, at *3 (C.D. Cal. 2011) (quoting *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227

F.3d 1110, 1114 (9th Cir.2000)).  A nonexclusive license may be granted expressly or impliedly through conduct. *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.1990).  An implied license may be found where conduct by the copyright holder leads another party to believe that they may use the copyright. *See Field v. Google, Inc.*, 412 F.Supp.2d. 1106, 1116 (D.Nev.2006) (citing *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236 (1927)).

Under Ninth Circuit law, an implied license exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute [the] work" or "use, retain, and modify the programs." *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754–55 (9th Cir.2008) (footnote and internal quotation marks omitted).

As noted, Mitchell does not dispute that he granted 3PL an implied license to use the TMS Software.  Indeed, Mitchell specifically alleges that "[he] granted 3PL an implied, revocable, non-exclusive license to use and license the [TMS] software he authored to third parties (on a month to month basis) while he worked with 3PL."  (Mitchell's Supplemental Response to 3PL Interrogatories, Set Two, No. 22, at 6; UP ¶ 42.)  Mitchell confirms this allegation in his Opposition, where he states that he "does not dispute that 3PL had an implied license to market and sub-license the TMS software while [he] worked for 3PL."  (Opp'n at 2:27-28.)  Because Mitchell admits that an implied license existed, the Court need not discuss the three-factor *Asset Marketing Systems* test.

### 2.1.2  Whether the Implied License Was Irrevocable

Mitchell claims that 3PL's implied license to use the TMS software was *revoked* when he was fired from 3PL in March 2011.  3PL argues that Mitchell's termination did not result in revocation of the implied license because the consideration Mitchell received for the license rendered it irrevocable.  The Court agrees with 3PL.

An implied license is irrevocable if the licensee paid consideration for it. *Asset Marketing Systems*, 542 F.3d at 757 ("[b]ecause [the licensee] paid consideration, this license is irrevocable."); *see also* 3-10 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[B][5] (2008) ("[A] nonexclusive license supported by consideration is a contract."). "If an implied license accompanied by consideration were revocable at will, the contract would be illusory." *Asset Marketing*, 542 F.3d at 757 (citing *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 882-83 (5th Cir. 1997)); *see also Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1120 ("[a] 'nonexclusive license supported by consideration is a contract' and is irrevocable") (citing *Asset Marketing Systems*, 542 F.3d at 757).

Mitchell received ample consideration for the TMS software. It is undisputed that from mid-2005 to November 2007, 3PL paid Mitchell over $100,000 for his services. 3PL also paid Mitchell more than $300,000 as a salaried employee from November 2007 until he was fired in March 2011. Besides these payments, Mitchell received a sizeable ownership stake in 3PL. The fees and salary Mitchell received along with his ownership stake in the company constitute consideration sufficient to render the implied license irrevocable. *See, e.g.*, *Asset Marketing Systems*, 542 F.3d at 750 (finding consideration sufficient to render an implied license irrevocable where an employer paid its software developer $2 million over a four-year period, "$250,000 of which was for custom software development and computer classes").

Mitchell argues that the only consideration he received for the implied license was "at-will employment" from 3PL, and that at-will employment does not qualify as valid consideration. (Opp'n at 4:21-25 (citing *Carson v.Dynegy*, 344 F.3d 446, 452 (5th Cir. 2003) (stating that promises of future at-will employment do not qualify as valid consideration because such promises are illusory)).) Even if the Court were to accept this premise, Mitchell's argument would still fail because Mitchell did not become an at-will employ of 3PL until 2007. As noted, between 2005 and 2007, Mitchell received valid consideration, including an ownership stake and payments for his services.

Mitchell also briefly argues that because he copyrighted the TMS software before 3PL was incorporated, 3PL couldn't have given him consideration for the software. This argument

fails in part because the 2003 Letter establishes, and Mitchell does not dispute, that he received compensation in October 2003 – a 25% stake in the future 3PL and a 6-month, $21,000 programming contract – to develop the TMS software. He was also promised and eventually received a salary in the "new enterprise" – which Mitchell acknowledges to be 3PL – "for the continued development, project management, and implementation of the [TMS] software." (3PL Ex. 39.)

### 2.1.3 Conclusion

The Court has considered Mitchell's other arguments and finds them unpersuasive, inadequately supported, or both. 3PL's implied license to use the TMS software was not revocable because Mitchell received consideration for it. *See Asset Marketing Systems*, 542 F.3d at 757. Because no genuine issue of material fact exists as to the irrevocable nature of the implied license, 3PL's Motion is GRANTED as to Mitchell's claim for copyright infringement.

3PL also argues that equitable estoppel bars Mitchell's claim for copyright infringement. Because the Court holds that 3PL's implied license is irrevocable, the Court need not address the parties' arguments concerning equitable estoppel.

### 2.2 Mitchell's Second and Third Claims, for Unfair Competition

Mitchell asserts two unfair competition claims – one under California Business and Professions Code § 17200 and one under common law. These two claims are entirely derivative of Mitchell's copyright infringement claim and fail for the reasons just given. Mitchell's unfair competition claims also fail because they are preempted by the Copyright Act. *See Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) ("A state law cause of action is preempted by the Copyright Act if two elements are present. First, the rights that a plaintiff asserts under state law must be 'rights that are equivalent' to those protected by the Copyright

Act. . . . Second, the work involved must fall within the 'subject matter' of the Copyright Act . . . .") (citing 17 U.S.C. §§ 102, 103, 301(a)).

In his Opposition to 3PL's Motion, Mitchell cites only one paragraph from his Complaint that purportedly contains allegations not based on 3PL's alleged copyright infringement. That paragraph states the following:

> In or around November 2007, plaintiff became an employee of 3PL systems. From June 2005 to the present, 3PL Systems has used the [TMS] Software in the operation of its business. In consideration for his continued employment, MR. MITCHELL licensed TMS to 3PL Systems. On or about March 17, 2011 defendants discharged plaintiff's employment without good cause and terminated its license for the Software. However, 3PL SYSTEMS continues to use, sell and offer to sell TMS to customers. 3PL SYSTEMS now refers to TMS by the name "BrokerWare."

(Complaint ¶ 16.) Based on this allegation, Mitchell argues that "3PL improperly terminated Mr. Mitchell in order to remove him from 3PL and steal, *inter alia*, his copyright in the TMS software." (Opp'n at 8:13-14 (citing Complaint ¶ 16).)

Mitchell's contention that this paragraph contains allegations exceeding the scope of his copyright claim fails for several reasons. First, Mitchell does not explain why 3PL is liable for terminating his *at-will* employment without good cause. *See Singh v. Southland Stone, U.S.A., Inc.*, 186 Cal. App. 4th 338, 354 (2010) ("There is no requirement that the party terminating an at-will employment act in good faith or with good cause.") (citing *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 375 (2000)).

Second, Mitchell does not *allege* in his pleadings what he *argues* in his Opposition – namely that "3PL improperly terminated [him] in order to remove him from 3PL and steal . . . his copyright in the TMS software." (Opp'n at 8:13-14.)

And third, the rights Mitchell seeks to protect by asserting claims for unfair competition are not "qualitatively different from the copyright rights." *Del Madera Properties v. Rhodes and*

*Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) (overruled on other grounds) (finding that plaintiff's unfair competition claim was preempted despite plaintiff's argument that defendant also breached its fiduciary duty to plaintiff). Mitchell's unfair competition claims are "part and parcel" of his copyright claim because they seek to vindicate rights in the TMS software under the Copyright Act. *See id.*

**DISPOSITION**

The Court GRANTS 3PL's Motion and DENIES Mitchell's Motion.

IT IS SO ORDERED.

DATED: April 9, 2012

_____
                    Andrew J. Guilford
                    United States District Judge