BROWN, WEGNER & BERLINER LLP
William J. Brown, Jr. (SBN 192950)
  bill@bwb-lawyers.com
Matthew A. Berliner (SBN 224384)
  mberliner@bwb-lawyers.com
Matthew K. Wegner (SBN 223064)
  mwegner@bwb-lawyers.com
Janet S. Park (SBN 263511)
  jpark@bwb-lawyers.com
2603 Main Street, Suite 1050
Irvine, California 92614
Telephone: 949-705-0080
Facsimile: 949-794-4099

Attorneys for Defendant/Cross-Complainant
3PL SYSTEMS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER L. MITCHELL, III, an individual,<br><br>             Plaintiff,<br><br>      v.<br><br>3PL SYSTEMS, INC., a California Corporation,<br><br>             Defendant.<br><br>3PL SYSTEMS, INC., a California corporation,<br><br>             Cross-Complainant,<br><br>      v.<br><br>WALTER L. MITCHELL, III, an individual, JONATHAN LANSAGAN, an individual, CHRISTOPHER VINCIGUERRA, an individual, TRINNOS TECHNOLOGY LLC, a California Limited Liability Corporation, and ROES 1 – 10, inclusive,<br><br>             Cross-Defendants. | Case No.: SACV11-00534 AG(ANx)<br><br>**DEFENDANT/CROSS-COMPLAINANT 3PL SYSTEMS, INC.'S TRIAL BRIEF**<br><br>**Trial Date:**      **November 6, 2012**<br>**Time:**               **9:00 a.m.**<br>**Courtroom:**      **10D**<br><br>**Before the Hon. Andrew J. Guilford**<br><br><br><br><br><br><br><br><br><br>**Complaint filed:**      **April 7, 2011** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF RELEVANT FACTS........................................... 2

      A.   DTS And Freightsaver.com Software. ..................................... 2

      B.   Mitchell Agrees To Further Develop The TMS Software For DTS And
           Thereafter DTS Pays Mitchell To Do So. ................................ 3

      C.   DTS Develops The TMS Software And Begins To Use It In Its Freight
           Business. ................................................................................. 4

      D.   3PL Is Formed, And Operated By Mitchell, To Further Develop, Market,
           And License The TMS Software............................................... 4

      E.   Mitchell Files Three Copyright Applications In His Own Name Without
           Informing His Fellow 3PL Shareholders. ............................... 6

      F.   A Dispute Arises Between 3PL Shareholders; Mitchell Files His
           Complaint And For The First Time Alleges That He Could Prohibit 3PL
           From Using The Software. ....................................................... 7

      G.   After Mitchell Is Terminated, He Starts Trinnos Technology LLC, A
           Competing Company, And Files His Complaint. ..................... 7

      H.   Lansangan And Vinciguerra Quickly Join Trinnos, And Use 3PL's
           Information To Solicit Customers Away From 3PL................... 9

III.  OWNERSHIP OF THE COPYRIGHT REGISTRATIONS............. 9

      A.   Work For Hire Under *Community For Creative Non–Violence v. Reid*. 10

      B.   CCNV Factors Applied To Mitchell's Relationship With DTS. ............ 11

           Factor 1 - Duration Of The Relationship Between The Parties .............. 12

           Factor 2 - Payment.................................................................. 13

           Factor 3 - Business Of Hiring Party ....................................... 13

           Factors 4 Through 6 - Discretion Over When, Where, And How Long To
           Work....................................................................................... 13

i

Factor 7 - Tax Treatment .......................................................................... 14

Factor 8 - Whether DTS Had The Right To Assign Additional Projects
　　　　To Mitchell ...................................................................... 15

Factor 9 - Skill Required ........................................................................ 15

Factor 10 - Mitchell's Role In Hiring And Paying Assistants ................ 15

C.　The Subsequent Registrations Are Also Owned By 3PL Because
　　Mitchell Created The Software For 3PL Under Work For Hire
　　Exception ........................................................................................ 15

D.　DTS Specifically Commissioned The TMS To Be Created By Mitchell
　　Under A Written Agreement. .................................................................. 17

E.　The 2002 And 2003 Letters Constitute A Written Agreement For A
　　Work For Hire Under 17 USC Section 101(2) ...................................... 18

IV.　THE 2011 REGISTRATION IS OWNED BY 3PL AS AUTHOR ................. 19

V.　THE LETTERS ALSO CONSTITUTE AN ASSIGNMENT OF ANY RIGHTS
　　IN THE TMS SOFTWARE ............................................................................. 19

VI.　BREACH OF FIDUCIARY DUTY/FRADULENT CONCEALMENT .......... 20

VII.　OTHER CLAIMS ............................................................................................ 22

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4    *Aymes v. Bonelli*, 980 F.2d 857 (2nd Cir. 1992).................................................... 13, 15

5    *Community For Creative Non–Violence v. Reid*, 490 U.S. 730 (1989).......... 10, 11, 13

6    *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 711 (2nd Cir.1992)........... 17

7    *Harbor Software, Inc. v. Applied Systems, Inc.,* 925 F.Supp. 1024 (S .D.N.Y.1996). 17

8    *Hartley v. Superior Court*, 196 Cal.App.4th 1249 (2011) .......................................... 18

9    *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th. Cir. 2010) ........................................ 11, 14

10   *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, 2004 WL 1781009 at *8 (S.D.N.Y.

11        2004) ......................................................................................................... 17

12   *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ....................................... 11

13   *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549 (2nd Cir. 1995)............................ 17

14   *See Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d

15        1211 (9th Cir. 1997)........................................................................................ 16

16   *Twentieth Century Fox Film Corp, v. Entertainment Distributing*, 429 F.3d 869 (9th.

17        Cir. 2005) ....................................................................................................... 11

18   *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir.2003) ..................... 18

19

20

## STATUTES

21   17 U.S.C. § 101 ..................................................................................................... 10, 17

22   17 U.S.C. § 102 ......................................................................................................... 10

23

24

## OTHER AUTHORITIES

25   Restatement (Second) of Agency § 220(2) (1958) ..................................................... 11

26

27

28

# I.      **INTRODUCTION**

This lawsuit centers primarily on a dispute over the ownership and rightful use of a "transportation management system" ("TMS") software used by freight brokers to manage shipments for customers and other aspects of their business.  In 2002, a freight brokerage company and several individuals agreed to collaborate to develop a comprehensive TMS software product.  As part their efforts, in 2005 they formed Defendant and Cross-Complainant 3PL Systems, Inc. ("3PL") for one purpose: to develop, market and license the TMS software to freight brokers.  Plaintiff Walter Mitchell III ("Mitchell") was a founding member of 3PL and remains a 30% shareholder.  Mitchell worked with his fellow 3PL shareholders and Diversified Transportation Systems ("DTS")--the freight brokerage owned by those fellow shareholders--to create the software.  3PL continued to develop and enhance the software since it became commercially operational in 2005.  DTS and 3PL provided all of financial capital to create, develop, and promote the software, including all salary and other payments to Mitchell since 2002.  3PL also hired and paid programmers, in addition to Mitchell, to work on and further develop the software.  By his Complaint for copyright infringement, Mitchell sought to seize control of 3PL's only product and put 3PL out of business.

In response to a management dispute that had been brewing with his fellow shareholders for months, Mitchell unilaterally took control of 3PL's computer system in March 2011and locked the other officers, shareholders and 3PL employees out of the system.  As a consequence, 3PL terminated Mitchell's employment and his position as an officer of 3PL.  In his copyright suit filed in April 2011, Mitchell claimed *for the first time in the six-plus years* that 3PL existed, that he was the sole owner of the TMS software and sought to exclude 3PL from using and selling the software as it has done since its inception.  In his Complaint and in discovery responses, Mitchell took the position that 3PL's prior use of the software was allowed under an "implied license" that existed between him and 3PL only while he remained

CASE NO: SACV11-00534 AG(ANx)
**3PL SYSTEMS, INC.'S TRIAL BRIEF**

an "employee" of 3PL.  Having been terminated, Mitchell claimed that he unilaterally revoked the implied license.  However, this Court ruled ***that if*** Mitchell is the rightful owner of the software (which of course 3PL disputes), the implied license he granted 3PL is irrevocable as a matter of law.  The Court dismissed Mitchell's entire Complaint, leaving only 3PL's Cross-Complaint against Mitchell, the new company he founded to market the software (Trinnos), and ex-3PL employees Jon Lansangan and Chris Vinciguerra, who defected from 3PL to join Trinnos.  In its Cross-Complaint, 3PL seeks a declaration of ownership of the software and asserts various commercial tort claims, including breach of fiduciary duty, contributory copyright infringement, and fraudulent concealment, among others.

## II.   STATEMENT OF RELEVANT FACTS

### A.   DTS And Freightsaver.com Software.

In 1991, Marc Meskin and Robby Thone formed a freight transportation brokerage firm called DTM Services dba Diversified Transportation Systems ("DTS"). In 1992, DTS developed software for their brokerage services, hiring Bob Dennis to develop the software.  In 2000 Meskin and Thone gathered a group of DTS employees to implement their idea of marketing and licensing a shipping software slightly different than the freight broker software used by DTS.  One member of this group, DTS employee "Buster" Schwab, informed Meskin that he knew a software programmer, and contacted Mitchell to see if he would work with the group in developing the software.  Mitchell, along with Schwab, Meskin, and Thone teamed up together to work on a venture to create a "transportation management system" software entitled Frieghtsaver.com.  The group made Mitchell responsible for the actual programming of the application.  However, because Mitchell had no prior experience in the freight industry, Meskin, among others, assisted Mitchell in the design and development of the proposed software.

Although the Freightsaver.com software never became operational, the group decided on August 8, 2002, to sell the unfinished software to DTS so that DTS could

convert the software into a comprehensive transportation management software brokerage product.  The agreement to sell the Freightsaver.com software to DTS is memorialized in a 2002 "Letter of Understanding," which states: "Diversified Transportation Services wishes to purchase the framework for the incomplete Freightsaver.com software package for the purposes of converting the product to a comprehensive software brokerage product."   (The 2002 Letter is attached as **Exhibit A** hereto.)  As consideration for the Freightsaver.com software, DTS paid some members of Freightsaver.com group in cash, but other members declined the cash payment, instead opting for future use of the software at discounted rates. Mitchell executed the 2002 Letter and declined the cash payment.  The 2002 Letter specifically dictated that a new enterprise would be formed to market DTS' brokerage software product once it became operational.  The reason for that was there was and is a huge market to sell brokerage software to other freight brokers.  This new enterprise formally became 3PL Systems, Inc.

> **B.     Mitchell Agrees To Further Develop The TMS Software For DTS And Thereafter DTS Pays Mitchell To Do So.**

On October 21, 2003, Mitchell and Meskin executed a second Letter of Understanding that had been prepared by Mitchell.   (Attached as **Exhibit B** hereto) The 2003 Letter memorialized an agreement for the "***continued development and future intentions of the transportation brokerage office management software (referred to as "TMS")***" [emphasis added].  Importantly, the provision of the 2003 Letter stating that Mitchell "will have exclusive rights to develop and manage the development of the TMS software" was crossed out and initialed by both Mitchell and Meskin.  The 2003 Letter also dictated that "At the time the TMS is marketed and sold a new enterprise will be formed."  The parties admit that the "new enterprise" referenced in the 2003 Letter became 3PL.  Both Mitchell and Meskin agreed that DTS would pay Mitchell a flat monthly fee for his efforts and that "Mitchell will be granted a contract for the continued development of the software."  While no new

1   formal written contract was executed, DTS paid Mitchell for his efforts until mid-

2   2005, when 3PL was formed and 3PL began paying Mitchell.

3   **C.   DTS Develops The TMS Software And Begins To Use It In Its**

4   **Freight Business.**

5   From late 2002 until late 2005, DTS paid Mitchell to develop the proposed

6   transportation management software in accordance with the two Letters of

7   Understanding.  DTS also paid other programmers to work on the software.

8   Importantly, Mitchell admitted to Meskin that he was using the earlier

9   Freightsaver.com software as the foundation or "spring board" for the TMS software

10   and admitted that he did in fact use the Freightsaver.com code in the software.

11   Indeed, in deposition Mitchell admitted that there are many similarities between this

12   new transportation management software and Freightsaver.com software.  The new

13   TMS software included everything in the Freightsaver.com software, with additional

14   functions.

15   In furtherance of the development of the software, Meskin participated in many

16   meetings with Mitchell to discuss how the software should operate, the design of the

17   software, the business rules, and the freight brokerage business.  Mitchell worked with

18   DTS and Meskin from 2002 to 2005 developing the software.   Mitchell issued

19   monthly invoices to DTS for flat fees that DTS paid.  From 2002 to 2005, DTS hired

20   and paid for other software developers, who wrote source code for the TMS software

21   in conjunction with Mitchell.  The TMS software first became operational in early

22   2005, and DTS began using it in its business.   During this time, Mitchell performed

23   other duties for DTS, including, fixing computers, installing telephones, purchasing

24   copies, and buying servers.

25   **D.   3PL Is Formed, And Operated By Mitchell, To Further Develop,**

26   **Market, And License The TMS Software.**

27   Mitchell and Meskin began marketing and licensing the TMS software to third

28   parties before 3PL was officially incorporated.  Indeed, Mitchell prepared end-user

4

license agreements for customers, including such agreements in April 2005, that indicated 3PL was already operating.  In April of 2005, Meskin and Mitchell also attended a trade show to market the software.  Essentially, the "venture" was ongoing once the software was operational.  3PL was officially incorporated by Mitchell, Meskin, and Thone on June 1, 2005.  Everyone agrees that 3PL is the new enterprise referenced in the 2002 and 2003 Letters.  Initially, DTS continued to pay for any costs associated with getting 3PL up and running.

From 3PL's inception until his employment was terminated in March 2011, Mitchell was a board member and officer of 3PL.  During this period of time, Mitchell was in charge of managing and operating 3PL – including the hiring of staff, marketing, sales, and the day-to-day management of 3PL.  Mitchell also took part in marketing and selling the software to potential 3PL clients, developing agreements to use for licensing the software, and other managerial tasks related to the company. During this period of time, Mitchell, along with the assistance of others, developed the "Quickbooks" functionality of the TMS software.  This functionality was very important to 3PL's business as many smaller freight brokers used Quickbooks for their accounting, and having it integrate with the TMS software allowed 3PL to market the software to a wider array of freight brokers.  The Quickbooks functionality became operational in late 2006 or early 2007.  Other new, important, functionality was imported to the software *after* it became operational in 2005.

From 2005 to November 2007, 3PL paid Mitchell a monthly flat fee for his work and issued him a yearly Form 1099 (though he was always an officer of 3PL). 3PL paid for any costs associated with the operation of the company.  Mitchell's monthly invoices to 3PL (and DTS before 3PL existed) stated that his work was for "application development,"  "application" being another name for the TMS software. Mitchell was paid by 1099 at his request.

Starting in November 2007, Mitchell was paid as a "W-2 employee" of 3PL, though his duties and job functions did not change.  From 2008 through 2011, 3PL

retained as many as four additional programmers who assisted in developing the software, updating the code and adding new functionality to the TMS software.  3PL paid these programmers, who worked full time for 3PL.  Indeed, all 3PL employees would take part in weekly planning/brainstorming sessions to develop new aspects of the software.  From 2007 until Mitchell was terminated in March 2011, the source code to the software was stored on 3PL's computer systems.  Prior to that, the object code was stored on 3PL's computer systems. However, given Mitchell's status as an officer of 3PL, 3PL always had access to the source and object code of the TMS software.

**E.   Mitchell Files Three Copyright Applications In His Own Name Without Informing His Fellow 3PL Shareholders**.

Unbeknownst to Meskin or Thone, on February 22, 2005, Mitchell filed a registration in the Copyright Office, claiming for himself the rights to the "Transportation Management System" computer program (the "2005 Registration"). On June 26, 2007, Mitchell obtained a second copyright registration for "3PL Systems - Transportation Management System" computer program, previously titled "Transportation Management System" (the "2007 Registration").  Mitchell did not inform anyone at 3PL about this registration.  Mitchell's 2007 Registration papers stated: "This is a new version of the software with substantial additions and updates." During this same period of time, Mitchell prepared webpages for 3PL that specifically stated that the software was copyrighted in 3PL's name.  In deposition, Mitchell indicated that this was a mistake – but could give no reason why or how he could make such a mistake when he believed that he always owned the TMS software at all times.

On October 28, 2010, Mitchell obtained a third copyright registration for "BrokerWare-TMS," previously titled "Transportation Management System" and "3PL Systems - Transportation Management System ("2010 Registration").  The 2010 Registration indicates that the "author" created: "[n]ew revised test, updated

1    compilation, editing, new and revised computer program code." The 2010

2    Registration did not identify any other alleged authors even though Mitchell admits

3    that the other 3PL programmers' efforts were included in the software subject to the

4    2010 Registration.

5        3PL subsequently sought and obtained Copyright registrations for the TMS

6    Software as it existed in or about the end of 2010 (the "2011 Registration").

7    **F.    A Dispute Arises Between 3PL Shareholders; Mitchell Files His**

8        **Complaint And For The First Time Alleges That He Could Prohibit**

9        **3PL From Using The Software**.

10        In late 2010, there was an internal review of 3PL's books and records. The

11   review focused on whether business expenses were being used properly and how

12   employees were being compensated. From December 2010 through March 2011,

13   Meskin and Thone had several meetings with Mitchell regarding Mitchell's use of his

14   3PL company credit card/expense account and the manner in which employees of

15   3PLwere being compensated among other subjects.

16        On January 25 and 31, 2011, in response to the review and a breakdown in

17   Thone's, Meskin's and Mitchell's relationship, Mitchell proposed splitting 3PL into

18   two entities – each continuing the business of developing and licensing the TMS

19   software. Thereafter, on February 2, 2011, Mitchell specifically presented a proposal

20   to Meskin and Thone, for splitting 3PL into two separate companies. In response,

21   Meskin and Thone retained an IT/software consultant named Cody Saunders to

22   evaluate the feasibility of splitting 3PL into two companies and to perform an audit of

23   3PL's technology. At no time during any of these conversations did Mitchell inform

24   Thone or Meskin that he believed that he alone owned the TMS software and could

25   seek to stop 3PL from using and sub-licensing the software.

26   **G.    After Mitchell Is Terminated, He Starts Trinnos Technology LLC, A**

27        **Competing Company, And Files His Complaint**.

28        On March 16, 2011, Meskin, Thone and Mitchell scheduled a meeting in Irvine.

However, due to traffic and Meskin becoming ill, Thone called Mitchell to inform him that they would not make the scheduled meeting.  In response, Mitchell threatened Thone, telling him that the meeting had to go forward and that he had locked everyone out of 3PL's computer systems.  Thone and Meskin later learned that Mitchell did so by calling 3PL's external server company and changing all of the passwords on 3PL's servers and networks.  Mitchell also changed the passwords to 3PL's email server, firewall, e-fax system, and databases.  3PL's employees could not access their emails or otherwise perform their work.  Mitchell had this ability because he had managed 3PL's computer systems during his employment with 3PL.  At the time, Mitchell informed 3PL's IT consultant that he was locking people out of the system because of the dispute he was having with Meskin and Thone, and that the consultant had to "pick a side."  Because of Mitchell's actions on March 16th, 3PL terminated Mitchell's employment, effective March 17, 2011.  On the same day, at around 11:54PM, Meskin received 3 consecutive emails from his own account with photographs of his family attached.  Meskin did not send these emails to himself, and Mitchell had access to DTS's computer system.  Naturally, Meskin interpreted the emails as Mitchell threatening the safety of Meskin's family.  Mitchell claims that the "lock-out" was merely an innocent and routine security protocol - however he can provide no evidence, documentary or otherwise, substantiating that claim.

Subsequently, on March 27, 2011 Mitchell filed an unemployment insurance claim with the California Employment Development Department.  Mitchell stated in his application that the reason for separation was a "business dispute."  The claim was denied and Mitchell thereafter appealed the EDD's denial.  Mitchell filed his appeal one month after he filed his Complaint against 3PL, and while he was employed at Trinnos.  Before the hearing on the appeal, Mitchell dropped his claim on advice of his counsel.

On April 7, 2011, Mitchell sent a letter to 3PL resigning as an officer of 3PL.  On the same day, Mitchell filed his Complaint alleging copyright infringement and

two unfair competition claims that were based entirely on the copyright infringement allegations.  Mitchell sought an injunction against 3PL.  This was the first instance that Meskin or Thone learned that Mitchell was claiming ownership of the TMS software. On April 11, 2011, Mitchell incorporated a competing software company, Trinnos Technology, LLC, which is a named cross-defendant in this litigation.

### H.  Lansangan And Vinciguerra Quickly Join Trinnos, And Use 3PL's Information To Solicit Customers Away From 3PL.

Shortly after Trinnos was incorporated, 3PL employees Vinciguerra and Kristen Busk sent their resignation letters to 3PL.  Moreover, Vinciguerra admitted to using an anti-forensic program to delete 3PL's electronic data from his 3PL laptop before returning the laptop to 3PL.  Although he was able to remove/save all of his personal files from the 3PL laptop prior retuning it, he nevertheless chose to delete and destroy all of the business information belonging to 3PL.

Lansangan also resigned from 3PL on May 4, 2011 in order to join Trinnos. After resigning from 3PL, Lansangan immediately began contacting 3PL customers to induce those 3PL customers to stop licensing their TMS software from 3PL and start licensing the same TMS software from Trinnos.  Mitchell and Lansangan claim to have contacted 3PL customers using a list posted on 3PL's website; but 3PL's website does not contain contact information, such as email addresses or contact names, for the customers.  As 3PL customers terminated their contracts with 3PL, Mitchell, Vinciguerra, and Lansangan enlisted the help of 3PL employees Daniel Ely and Mezar Chakwa to aid these new Trinnos customers in transferring their data from 3PL servers to Trinnos servers.  Soon after, Daniel Ely resigned from 3PL's employment to join Trinnos.

## III.  OWNERSHIP OF THE COPYRIGHT REGISTRATIONS

Mitchell's main defense to 3PL's claims is that he is the sole owner and author of the TMS software that is currently being marketed and sub-licensed by both Trinnos and 3PL.  3PL is listed as the owner of the TMS software in its 2011

Registration, while Mitchell is listed as the author of the TMS software in his 2005, 2007, and 2010 Registrations.  The parties agree that ownership is an issue for the Court to decide.

3PL is the author of the TMS software at all relevant times because: a) <u>Mitchell was a work for hire</u> under the "CCNV" factors, b) Mitchell was a work for hire under a written agreement, and/or c) Mitchell assigned his rights to the TMS software to DTS, which in turn assigned its rights to 3PL.  Moreover, even if Mitchell is declared the owner of the 2005 Registration and the software as of that date, 3PL is the owner of the 2007 and 2010 Registrations as these derivative works were clearly made while Mitchell was an "employee" of 3PL. And now his use of those "versions" is infringing.

> **A.    Work For Hire Under *Community For Creative Non–Violence v. Reid*.**

The Copyright Act states that the author of a given work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community For Creative Non–Violence v. Reid*, 490 U.S. 730, 737 (1989) (citing 17 U.S.C. § 102). The Act contains an important exception for certain works "made for hire."  A "work made for hire" is - "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101.

Here, 3PL can demonstrate that the original software as referenced in the 2005 Registration was owned and authored by DTS under both prongs of the work for hire exception.  Moreover, to the extent that the Freightsaver.com software was used as the "springboard" for the TMS software as Mitchell told Meskin, that part of the software

1   is owned by DTS (and now 3PL).

2          Mitchell's actions fit the work for hire exception of 17 U.S.C. § 101(1) because

3   Mitchell created the TMS software within the scope of his employment with DTS and

4   then subsequently 3PL.  Mitchell argues that because he was not a DTS employee for

5   tax purposes, that he cannot be a work for hire under the CCNV factors.  However,

6   courts have expanded the work for hire concept to include less traditional

7   relationships, including independent contractors.  *Twentieth Century Fox Film Corp,*

8   *v. Entertainment Distributing*, 429 F.3d 869, 877 (9th Cir. 2005); *U.S. Auto Parts*

9   *Network, Inc. v. Parts Geek, LLC*, ---F.3d--- 2012 WL 3764704 at *7 (9th Cir. 2012).

10   The determination of whether Mitchell was an "employee" under the work for hire

11   exception is a mixed question of law and fact.  429 F.3d at 877.

12          **B.      CCNV Factors Applied To Mitchell's Relationship With DTS.**

13          The Supreme Court in *Community For Creative Non-Violence v. Reid*, 490 U.S.

14   730 (1989) ("CCNV") explained that the terms "employee," "employer," or "scope of

15   employment," incorporate principles from the general common law of agency.  490

16   U.S. at 740-41.  Accordingly, "the hiring party's right to control the manner and

17   means by which the product is accomplished" is the main inquiry here.  *Id*. at 751.

18   Factors relevant to this inquiry include: the skill required for that occupation, the

19   source of the instrumentalities and tools, the location of the work, the duration of the

20   relationship between the parties, whether the hiring party has the right to assign

21   additional projects to the hired party, the extent of the hired party's discretion over

22   when and how long to work, the method of payment, the hired party's role in hiring

23   and paying assistants, whether the work is part of the regular business of the hiring

24   party, whether the hiring party is in business, the provision of employee benefits, and

25   the tax treatment of the hired party.  *Id*. at 751-52 (citing Restatement (Second) of

26   Agency § 220(2) (1958).  Because "the common-law test contains no shorthand

27   formula or magic phrase that can be applied to find the answer, all of the incidents of

28   the relationship must be assessed and weighed with no one factor being decisive."

1  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992).

2      *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010) is exactly in line with the

3  facts before this Court.  In *JustMed*, the Ninth Circuit weighed the CCNV factors

4  according to their significance relating to the fact that the plaintiff was a startup

5  software company similar to 3PL (or a startup product as DTS was creating).   600

6  F.3d 1118, 1126 (9th Cir. 2010) ("While no one factor is decisive, we draw some

7  guidance in weight the factors from JustMed's status as a technology start-up

8  company.") The Court reviewed the facts based on the way JustMed operated, which

9  is different from the way other companies operate. For example, JustMed did not

10  exercise much control over the manner and means by which the defendant

11  programmer created the source code.  *Id*. at 1127.  The Court held that the "control

12  over manner and means" factor was less important when the plaintiff is a technology

13  start-up company, because computer programmers in such companies are expected to

14  work independently. *Id*. (citing Restatement (Second) of Agency § 220, comment e,

15  "the custom of the community as to the control ordinarily exercised in a particular

16  occupation is of importance."); *see also U.S. Auto Parts Network, Inc.*, ---F.3d--- 2012

17  WL 3764704 at *7 (noting that court placed little weight on the fact that the work was

18  done at home or in the off hours).  Here, an analysis of the factors with the facts

19  demonstrate that the version of the TMS software registered by the 2005 Registration

20  was made while Mitchell was an "employee" of DTS.

21                    **Factor 1 - Duration Of The Relationship Between The Parties**

22      DTS retained Mitchell to create the TMS software regardless of how long it

23  took.  Indeed, there was no "end date" to the 2003 Letter.  While the 2003 Letter set a

24  preliminary time of six months, that length of time was to be "renegotiated" and

25  Mitchell was to work full-time in the new enterprise thereafter.  And in fact, Mitchell

26  was paid after the six months expired until his ultimate termination by 3PL in 2011.

27  Indeed, both Mitchell and DTS contemplated a relationship of indefinite duration,

28  which cuts in favor of finding Mitchell an employee.  *See JustMed*, 600 F.3d at 1126.

This intent is evidenced by the 2003 Letter, where Meskin and Mitchell agreed to form a company together to market and license the TMS software once it became operational.

### Factor 2 - Payment

DTS paid Mitchell in the form of monthly fixed amounts, rather than by hourly amounts.  Thus Mitchell's pay was similar to a regular monthly salary.  This too weighs heavily in favor of finding Mitchell an employee.  600 F.3d at 1126.  Moreover, the 2003 Letter contemplates a flat monthly fee for Mitchell's work.  DTS paid this amount for the contemplated amount of time, then gave Mitchell a raise and continued to pay Mitchell a regular monthly fee for his work.  This, too, weighs in favor of Mitchell being an employee.

### Factor 3 - Business Of Hiring Party

DTS' primary business was freight brokering, and used the TMS software for its core business.  Mitchell was hired by DTS to create the one piece of software that it would use to run its company.  In fact, DTS had previously hired other programmers to develop transportation management software for DTS' use.  Indeed, in documents prepared by Mitchell, he admits that the TMS software was created for DTS.  Further, Meskin and Mitchell contemplated creating a new company together for the sole purpose of marketing and licensing the TMS software to other freight brokers.  The parties all agree this entity became 3PL.  3PL's sole business is to develop and market the TMS software. This factor also favors DTS and 3PL.

### Factors 4 Through 6 - Discretion Over When, Where, And How Long To Work

While DTS did not exercise total control over the manner and means by which Mitchell created the source code, that is not a dispositive factor.  *See e.g., JustMed*, 600 F.3d at 1127; *U.S. Auto Parts Network, Inc.* 2012 WL 3764704 at *6-7.  DTS oversaw Mitchell's progress on the software continually so that the software was formed into a marketable product. *See Id.* (Computer programmer was expected to

1    work independently, noting that the extent of control the hiring party exercises is not

2    dispositive.)  Indeed, Meskin met with Mitchell regularly to make sure that the

3    software had the required functionality, interface, and applications.  *See JustMed*, 600

4    F.3d at 1127, citing *Aymes v. Bonelli*, 980 F.2d 857, 892 (2nd Cir. 1992) (input from

5    client regarding computer program's functions "weighs heavily in favor of finding

6    [programmer]…an employee").  These frequent meetings show that DTS, through

7    Meskin, was actively participating, and supervising the development of the TMS

8    software.  *See CCNV*, 490 U.S. at 751.  Similar to the circumstances in *JustMed*, the

9    duties of Mitchell did not require that the software be completed in a particular

10   manner or that DTS continuously oversee Mitchell's work, so long as DTS eventually

11   found itself with a usable and marketable product.  *See JustMed*, 600 F.3d at 1127

12   (citing CCNV, 490 US at 752).  Moreover, *JustMed* put little weight on the fact that

13   the computer programmer set his own hours and worked from home.  600 F.3d at

14   1127-28.  The nature of Mitchell's work means that Mitchell's ability to set his own

15   hours and the fact that he worked from home are not relevant. *Id*.

### Factor 7 - Tax Treatment

17        The Ninth Circuit did not consider a company's designation of a person as

18   employee or independent contractor as particularly relevant.  *JustMed*, 600 F.3d at

19   1127, fn. 5, citing *Vizcaino v. Microsoft Corp*., 97 F.3d 1187, 1189 (9th Cir.

20   1996)("Large corporations have increasingly adopted the practice of hiring temporary

21   employees or independent contractors as means of avoiding payment of employee

22   benefits, and thereby increasing their profits.")  Here, while it is undisputed that

23   Mitchell was given 1099 Forms while he worked for DTS and then for some time at

24   3PL, Mitchell eventually became a full-time employee after 3PL was formed.

25   Further, Mitchell requested that he get paid in this fashion.  Both DTS and Mitchell

26   contemplated Mitchell working full time for DTS.  Mitchell quit his job at Hyundai in

27   anticipation of working full time with DTS.  Simply put - "[The tax treatment] should

28   not make the company more susceptible to losing control over software integral to its

product." *JustMed*, 600 F.3d at 1128.

### Factor 8 - Whether DTS Had The Right To Assign Additional Projects To Mitchell

Mitchell also performed other work for DTS and then later 3PL.  In addition to programming, Mitchell attended trade shows, and marketed the TMS software. Further, prior to 2005, DTS had Mitchell perform other tasks, such as tech support, purchasing computers, copiers and telephones for DTS, and Mitchell did not charge any additional fees for that work.   Like in *JustMed*, this indicates that DTS could have assigned Mitchell other projects, and the relationship with DTS was intended to be more than merely that of one with an independent contractor.  600 F.3d at 1126.

### Factor 9 - Skill Required

Although computer programming is a highly skilled profession, given the other factors and the fact that DTS's regular business requires it to employ programmers, this factor is not conclusive of Mitchell being an independent contractor.  *See JustMed*, 600 F.3d at 1128.

### Factor 10 - Mitchell's Role In Hiring And Paying Assistants

"The authority to hire assistants" is also virtually meaningless in a situation where the hired party does not need assistants." *Aymes*, 980 F.3d at 864.  While Mitchell may not have required assistants, DTS did give him the authority to work with third party suppliers and programming companies. And DTS hired and paid third parties to write code for the TMS software.

### C. The Subsequent Registrations Are Also Owned By 3PL Because Mitchell Created The Software For 3PL Under Work For Hire Exception.

From June 2005 to November 2007, Mitchell was clearly a work for hire "employee" of 3PL under the CCNV factors.  3PL was incorporated in June 2005, where Mitchell was in charge of filing the necessary paperwork for incorporation.  At the same time, DTS transferred its rights to the TMS software to 3PL, so that 3PL

could start marketing and licensing the software.  At the time of incorporation, Mitchell was an officer and board member of 3PL per the agreement between Mitchell and Meskin.  It is not disputed that Mitchell ran the day-to-day operations of 3PL from its inception.  However, Mitchell chose to continue to be paid via 1099 by 3PL from October 2005 until November 2007 (DTS continued to pay Mitchell until October 2005).  Regardless of how he was paid, Mitchell was also an officer of 3PL and on its board of directors.  During this time, Mitchell filed the 2007 Registration, on June 26, 2007.  However, from June 2005 to November 2007, Mitchell was truly an "employee" of 3PL pursuant to the CCVN factors, and as such, 3PL owns any new software that was coded during this time. These subsequent registrations are independently copyrightable as derivative works because these updates were "more than trivial."  *See Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997); *U.S. Auto Parts Network*, 2012 WL 3764704 at * 4-5 (noting that the material contributed in a derivative work is distinguished from the pre-existing material).

Indeed, the 2007 Registration is informative of Mitchell's intent.  Mitchell entitled the work on the 2007 Registration as "3PL Systems - Transportation Management System." This demonstrates that Mitchell understood that the TMS software was owned by 3PL.  And Mitchell states in the 2007 Registration that "This is a new version of the software with ***substantial additions and updates***."  [Emphasis added.]  3PL agrees that in 2007, the TMS software had substantial additions, revisions, and updates, compared to the 2005 version of the TMS software.  Indeed, Mitchell's monthly invoices to 3PL indicated that he was performing "Application Development." This was the same description of the invoices to DTS.  However, at the time that the 2007 Registration was filed with the Copyright Office, Mitchell was working for 3PL as a work for hire employee, and thus 3PL should be considered the owner and author of the work referenced in the 2007 Registration.

It is also undisputed that in November 2007, Mitchell became a W-2 employee

of 3PL.  However, nothing else changed from before – he was still a 25% shareholder (later raised to 30%), officer, member of the board of directors and the primary person in charge of operating the business.  As such, there is no dispute that Mitchell was a full-time "employee" of 3PL from November 2007-2011 for purposes of the Copyright Act.  Therefore, Mitchell's 2010 Registration is also owned by 3PL. Mitchell stated in the 2010 Registration, that the registration was for "New and revised text, updated compilation, editing, and new and revised computer program code." The 2010 Registration lists the previous titles of the TMS, including the title "3PL Systems - Transportation Management Software."  Because Mitchell admits that there is new code during that time, 3PL is the author of that code.   Moreover, at least four other 3PL software developers contributed to the source code of the TMS software in 2010.  Mitchell did not declare these three developer's names on the 2010 Registration.

The fact that Mitchell was a full-time employee of 3PL in 2010, and the fact that other 3PL employees contributed to the updated TMS referenced in the 2010 Registration show that the 2010 Registration is actually authored and owned by 3PL, where Mitchell and other 3PL employees wrote new code under a work for hire for 3PL in 2010.

**D.     DTS Specifically Commissioned The TMS To Be Created By Mitchell Under A Written Agreement**.

 3PL also contends that the original TMS software was commissioned as a work for hire under a written agreement, pursuant to 17 U.S.C. § 101(2).  It is not disputed that the TMS software falls under the compilation category under 17 U.S.C. § 101.  Although a "computer program" is not listed as a category, case law holds that nonliteral elements of a computer program are properly considered a "compilation." *See Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 711–12 (2nd Cir.1992); *Harbor Software, Inc. v. Applied Systems, Inc.,* 925 F.Supp. 1024, 1047 (S.D.N.Y.1996).  As for the "specially ordered or commissioned" element in 17

U.S.C. § 101(2), the test is articulated in *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 560–61, 563 (2nd Cir. 1995), where the court held that the "specially ordered and commissioned" requirement has "essentially the same meaning as" the "instance and expense" test of the Copyright Act of 1909.  This test is met "when the motivating factor in producing the work was the employer who induced the creation." *Id*. at 554; *see also Logicom Inclusive, Inc. v. W.P. Stewart & Co*., 2004 WL 1781009 at *8 (S.D.N.Y. 2004).  Here, DTS was clearly the motivating factor in the creation of the TMS software.  There are two writings that are probative here - the 2002 and 2003 Letters of Understanding.

**E.      The 2002 And 2003 Letters Constitute A Written Agreement For A Work For Hire Under 17 USC Section 101(2).**

17 U.S.C. § 101(2) also requires a written agreement.  Here, the 2002 and 2003 Letters constitute a written agreement for Mitchell to be a work for hire for DTS.  The Ninth Circuit noted in *Warren v. Fox Family Worldwide, Inc*., 328 F.3d 1136, 1141 (9th Cir.2003) that "there is no requirement, either in the [Copyright] Act or the case law, that work-for-hire contracts include any specific wording."

Although Mitchell filed his 2005 Registration listing himself as the sole author of TMS, the 2002 and 2003 Letters show a contrary understanding of the agreement between Mitchell, Meskin and DTS.  Further, as the drafter of the 2003 Letter, any ambiguity in the agreement must be construed in favor of DTS and Meskin.  *Hunt v. Superior Court*, 81 Cal.App.4th 901, 909 (2000); *Hartley v. Superior Court*, 196 Cal.App.4th 1249, 1258 (2011) (stating that "We construe ambiguities against . . .  the drafting party").

The 2002 and 2003 Letters reveal that DTS wished to convert the Freightsaver.com product into a new transportation software brokerage product, and Mitchell was retained by DTS to do so.  The 2003 Letter references this brokerage product, as well as the previous owners of Freightsaver.com.  Both agreements show that Mitchell was retained by DTS to develop the TMS software.  Moreover, the

18

language in the 2002 and 2003 Letters should be evaluated with extrinsic evidence in order to discern the true intent of the parties, to which the language of the letters are reasonably susceptible.  Thus, the two Letters, and specifically the 2003 Letter, meet the requirements under 17 U.S.C. § 101(2), where the TMS software was a compilation, specially commissioned by the instance and expense of DTS and then later 3PL under a written agreement constituting a work for hire.

## IV.    THE 2011 REGISTRATION IS OWNED BY 3PL AS AUTHOR

3PL obtained a registration for its Brokerware Transportation Management Software from the Copyright Office in July 2011.  This 2011 Registration was for the TMS version as it was published at the end of 2010.  After it obtained the 2011 Registration, 3PL filed a Copyright Infringement claim against Mitchell and other cross-defendants.  Here, 3PL filed a registration within one year of the 2010 version of the TMS.  On October 5, 2010, 3PL released an updated version of TMS, including new features, functionality, design, refinements, and security.  These updates are from new source code created by 3PL employees, including three other full time employee software developers.  Mitchell was a full-time employee at the time that this update was implemented in October 2010.  Thus, 3PL's 2011 Registration constitutes prima facie evidence of the validity of its copyright and the facts stated in the 2011 Registration.  17 U.S.C. § 410(c).

## V.    THE LETTERS ALSO CONSTITUTE AN ASSIGNMENT OF ANY RIGHTS IN THE TMS SOFTWARE

Even if the TMS software was not a work for hire under the Copyright Act, the 2002 and 2003 Letters act as an assignment of the TMS software to DTS.  The Copyright Act defines "transfer of copyright ownership "as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright…but not including a nonexclusive license."  17 U.S.C. § 101.  *See Effects Associates*, 908 F.2d at 556, fn. 2.  "[17 U.S.C.]

> Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do."

908 F.2d at 557.   While the 2002 Letter was a clear assignment of rights to Freightsaver.com, it also outlined Mitchell's role in developing the software for DTS. Thereafter the 2003 Letter again affirms that it was the intent of the parties for DTS (and then some later entity), to own, manage and sell the TMS software. Thus, the 2002 and 2003 Letters satisfy the requirements of Section 204. Notably, both Mitchell and Meskin initialed the crossed-out term which stated, "Walter Mitchell will have exclusive rights to develop and manage the development of the TMS Software." This is a failed attempt by Mitchell to have Meskin agree in writing to transfer the rights to the TMS software to Mitchell. Therefore, DTS retained the exclusive right to develop and manage the development of the TMS software, in light of the crossed-out term. Moreover, the letter anticipates that the TMS software will be marketed and sold by a future entity. This also points to DTS having the rights to exclusively market and sell the software, then, after a new enterprise is formed, DTS would transfer such rights to exclusively market and sell the software to the new enterprise, 3PL.

## VI.   <u>BREACH OF FIDUCIARY DUTY/FRADULENT CONCEALMENT</u>

In addition to the Copyright claims discussed above, 3PL has alleged claims of Breach of Fiduciary Duty and Fraudulent Concealment against Mitchell. It is undisputed that Mitchell was a corporate officer of 3PL from its inception, who owed 3PL a duty to act as a reasonably careful corporate officer. *See Wolf v. Superior Court*, 107 Cal.App.4th 25, 30 (2003)("Traditional examples of fiduciary relationships in the commercial context include trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventurers, and agent/principal). As an officer with a fiduciary duty, Mitchell would have been

1   required to exercise "the most scrupulous observance of his duty, not only

2   affirmatively to protect the interests of the corporation committed to his charge, but

3   also to refrain from doing anything that would work injury to the corporation, or to

4   deprive it of profit or advantage which his skill and ability might properly bring to it,

5   or to enable it to make in the reasonable and lawful exercise of its powers." *Daniel*

6   *Orifice Fitting Co. v. Whalen*, 198 Cal.App.2d 791, 800 (1962).  Moreover, due to

7   Mitchell's fiduciary duties to 3PL, he owed 3PL a duty not to conceal facts that would

8   be detrimental to 3PL.  *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336 (1997); *Hobart*

9   *v. Hobart Estate Co.*, 26 Cal.2d 412, 433 (1945)("Greene, as president of the

10  corporation, had a duty to disclose to plaintiff any special facts, of which he had

11  knowledge, affecting the value of the stock and, in representing what the shares were

12  worth, to state what he honestly believed to be the fact.")

13         Here, Mitchell breached his fiduciary duties and/or fraudulently concealed facts

14  by, among other things, (1) failing to disclose that he believed he owned the TMS

15  software and/or that he was the owner of the TMS software; (2) allowing 3PL to

16  invest and incur substantial costs in further developing and marketing the TMS

17  software; (3) failing to protect 3PL's confidential trade secrets and customer data.

18  Mitchell further failed to act as a reasonably careful corporate officer when he locked

19  out everyone out of the computer systems on March 16, 2011.  And on or around

20  March 16, 2011, while he was a corporate officer, he took 3PL's source code,

21  marketing materials, human resources materials, and other electronically stored files

22  for use in his competition corporation Trinnos.  "Even in the absence of an express

23  agreement against revelation of trade secrets, a director is under a fiduciary duty not

24  to use or reveal them to the detriment of the corporation of which he is a director."

25  *Components for Research, Inc. v. Isolation Products, Inc.*, 241 Cal.App.2d 726, 729

26  (1966).  The evidence fully sustains the conclusion that Mitchell violated his fiduciary

27  duties to 3PL and/or fraudulently concealed the fact that he claimed or is the true

28  owner of the TMS software.

## VII.   <u>OTHER CLAIMS</u>

In addition to the Claims for Relief discussed herein, 3PL has alleged claims against Mitchell and his Co-Defendants for negligent misrepresentation, unfair competition, breach of contract, and contributory copyright infringement among others.  Many of the facts supporting these claims are the same or similar to the facts discussed above.


DATED:  October 30, 2012            BROWN, WEGNER & BERLINER LLP

By:    /s/ Matthew K. Wegner
_____
William J. Brown, Jr.
Matthew A. Berliner
Matthew K. Wegner
Janet S. Park

Attorneys for Defendant/Cross-Complainant
3PL SYSTEMS, INC.

# EXHIBIT  A

## LETTER OF UNDERSTANDING

### FREIGHTSAVER SOFTWARE PROGRAM PROPOSAL

Whereas, the rights to the software program known as "Freightsaver.com" are collectively owned by the following individuals:

| | |
|---|---|
| Walter Schwab | -20% |
| Bill Suwara | -20% |
| Marc Meskin and Robby Thone | -20% |
| Ryan Renne | -10% |
| Walter Mitchell | -10% |
| Roland Sunga | - 5% |
| Unassigned | -15% |

Diversified Transportation Services wishes purchase the framework of the incomplete Freightsaver.com software package for the purpose of converting the product to a comprehensive transportation software brokerage product. It is estimated that the cost to complete the project will be roughly $100-110,000 (not including Diversified Transportation resources) and that it will take 7-10 months.

In consideration for the release of the rights to the Freightsaver.com program, Diversified Transportation Services proposes the following:

- A total of $10,000 (lump sum) cash payment to be paid for the rights to the software. Amounts to be distributed to the individuals listed above in accordance with the percentage ownership outlined.

  -Any individual or group may forfeit up front cash payment in return for future use of newly completed software. Newly completed transportation brokerage software will be available to all Freightsaver.com principals at significantly reduced price. *CASH PAYMENT DECLINED*

- In the event that the newly created transportation brokerage software is marketed, a new enterprise will be established and will include all initial owners of Freightsaver.com software. Percentage ownership in new transportation brokerage software marketing enterprise will be determined by the additional costs incurred in software development.

If the proposal outlined above is acceptable please indicate your acceptance below.

Walter Mitchell _____ Date  8/8/2002

**EXHIBIT NO.**  47

**DATE:**    Jan 31, 2012

**WITNESS:  Mitchell**

Kimberly Bonnell, CSR#10668

EXHIBIT A

## EXHIBIT "A"

23

# EXHIBIT B

## LETTER OF UNDERSTANDING

### Software Development Proposal

This proposal is for the continued development and future intentions of the transportation brokerage office management software (referred to as TMS).

At the time that the TMS is marketed and sold a new enterprise will be formed with the following ownership:

Marc Meskin and Robby Thone                     70%
    (24% for time and effort, 44% for current and future capital investment,
    2% for existing freightsaver.com ownership)
Walter Mitchell                                              25%
    (24% for time and effort, 1% for existing freightsaver.com ownership)
Bill Suwara (from freightsaver.com)             2%
Buster Schwab (from freightsaver.com)         2%
Ryan Renne (from freightsaver.com)             1%
Roland Sunga (from freightsaver.com)          0%

Additionally, Walter Mitchell will be granted a contract for the continued development of the software. The contract will be for 6 months at $3,500.00 per month. The contract will start on November 1st 2003 and terminate on April 30th 2004. After the end of 6 months this contract can be renegotiated with the following considerations:

- If a new enterprise is formed then an agreed upon salary will be provided to Walter Mitchell for the continued development, project management, and implementation of the software. The terms of the salary will be determined at the time that formation of the new enterprise and will include a provision based on the success of the software.
- If continued development is requested and an enterprise is not formed both parties (Walter Mitchell and Marc Meskin) will agree to terms to extend the contract. This will include consideration for other installations of the software to help subsidize the cost of the contract.
- Walter Mitchell will have exclusive rights to develop and manage the development of the TMS software.

If the proposal outlined above is acceptable please indicate acceptance below.

_____          10/21/03
Walter Mitchell                                             Date

_____          10/21/03
Marc Meskin                                                Date

10/19/2003

**EXHIBIT NO.** _____49_____
**DATE:**      Jan 31, 2012
**WITNESS:  Mitchell**
Kimberly Bonnell, CSR#10668

- 12 -                                                     EXHIBIT B

**EXHIBIT "B"**
**24**

1

## **CERTIFICATE OF SERVICE**

2

3      The undersigned hereby certifies that all counsel of record who are deemed

4  to have consented to electronic service of documents are being served with a copy

5  of the foregoing document via the Court's CM/ECF system per Local Rules.

6

7

8                                              /s/ Matthew K. Wegner
                                               MATTHEW K. WEGNER
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28